IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

JUAN MACEDO MALDONADO,

Defendant.

CRIMINAL ACTION NO.
1:12-CR-319-TCB-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This case is before the court on Defendant Juan Maldonado's Motion to Suppress Search and Statement (Doc. 121), Motions to Suppress Intercepted Communications (Doc. 122, 158), Motion to Sever (Doc. 123), Motion to Suppress Search (Doc. 159), and Particularized Motion to Suppress Search of Residence and Statement (Doc. 207). For the reasons that follow, Defendant's Motions to Suppress should be **DENIED**. Docket Entries [121, 122, 158, 159, 207]. Defendant's Motion to Sever is hereby **DEFERRED** to the District Court for adjudication. Docket Entry [123].

## DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE OBTAINED FROM SEARCHES OF HIS VEHICLE AND RESIDENCE AND TO SUPPRESS HIS STATEMENTS

On September 25, 2012, the grand jury charged Defendant Juan Macedo Maldonado ("Defendant") with (1) conspiracy to distribute and possess with the intent

to distribute a mixture and substance containing cocaine hydrochloride and a mixture containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii); (2) conspiracy to transfer funds and currency from the United States to Mexico in order to promote the felonious manufacture, importation, receiving, concealment, buying, selling and otherwise dealing with a controlled substance and with intent to conceal the proceeds of the unlawful activity in violation of 18 U.S.C. § 1956(h); and (3) interstate communication of a threat to kidnap or injure another person with intent to extort from another money or a thing of value in violation of 18 U.S.C. §§ 2, 875. Docket Entry [19].

Defendant has filed multiple Motions to Suppress Evidence seized from searches of his residence as well as a motion to suppress statements he made to law enforcement officers. Therein, Defendant argues evidence obtained from the search of his residence should be suppressed because his consent for the search was obtained through intimidation and coercion and was the product of an illegal <u>Terry</u> stop of his vehicle. Defendant also contends that statements he made to law enforcement officers at his home should be suppressed because they were not voluntarily provided.

## I. FACTUAL BACKGROUND

During 2011 and 2012, the Drug Enforcement Agency ("DEA"), with the help of some deputized task force officers from local police departments, were investigating what they believe to be a Mexican-based drug trafficking organization ("MDTO"), operating with cells in Atlanta, Raleigh, North Carolina, and other parts of the United

States.  (Tr. 9-10).   Based on information gathered during intercepted telephone calls in late 2011, law enforcement officers believed that Defendant was a multi-kilogram distributor of methamphetamine and cocaine and a source of supply for people in Atlanta, Raleigh, and North Carolina.  (Tr. 11-12).   Defendant became one of the primary targets of the investigation.  (Id.).

### A.   Law Enforcement Officers Search a Mustang They Associated With Defendant and Believed to be Carrying a Suitcase Full of Contraband

On April 18, 2012, Deputy Task Force Officer Charles Kevin Cloninger ("DTFO Cloninger") was driving by an apartment that law enforcement believed to be a stash house for storing drugs or money.  (Tr. 13-14).   DTFO Cloninger observed co-defendant, Gabriel Macedo Maldonado, and another male, looking around while loading a suitcase into a grey Ford Mustang associated with Defendant and his associates.  (Tr. 9, 13-14).   DTFO Cloninger concluded that the suitcase was heavy because it took two hands to pick it up and put it in the trunk of the car.  (Tr. 15).   The two men did not have any other luggage.  (Tr. 15).   Based on DTFO Cloninger's training and experience, he believes suitcases are a common concealment method for drugs and money because suitcases may be moved freely in public without drawing a lot of suspicion.  (Tr. 15).   DTFO Cloninger also observed that after he drove by, the men waited several minutes before leaving the parking lot where the Mustang was located.  (Tr. 21).

After the men departed in the Mustang, DTFO Cloninger began to follow it because he believed a drug transaction was occurring.  (Tr. 15).   DTFO Cloninger

3

noticed that the Mustang made a couple of quick turns and both men in the Mustang appeared to be looking around. (Tr. 16). DTFO Cloninger testified that it appeared that their behavior was consistent with counter surveillance because looking around and making quick and unexpected turns helps individuals detect whether others are following them. (Tr. 16). Because DTFO Cloninger did not want the men to know he was following them, he pulled off the road and requested that other agents follow the Mustang. (Tr. 16). The members of the investigating team maintained radio and telephone contact and shared their observations throughout the day. (Tr. 19-20, 31).

The Mustang was ultimately located in the driveway of 1446 Chapel Hill Lane, a location agents believed to be frequented by Defendant and his codefendants based on previously collected GPS data. (Tr. 17). The agents began surveillance of the residence and later observed two men leave the residence and enter the Mustang. (Tr. 17). Subsequently, a Cobb County Police Department marked unit along with members of the DEA group investigating the MDTO stopped the Mustang while it was proceeding down Connecticut Road. (Tr. 17). The Defendant's brother was driving the Mustang at the time it was stopped, but no contraband was found. (Tr. 17).

**B.     Law Enforcement Stop and Search a Blue Minivan Driven by Defendant**

During the same time period, the officers observed a blue minivan previously identified as being associated with Defendant leaving the Chapel Hill residence. (Tr. 18-19). Shawn Jacobi, an Investigator with the Forsyth County Sheriff's Department

4

who was assigned to the DEA task force ("DTFO Jacobi"), pulled behind the minivan. (Tr. 19, 22, 25). At approximately 3:30 p.m., DTFO Jacobi, who was driving an unmarked Ford F-150 pickup truck, put on his blue lights and stopped the minivan after it pulled into a convenience store shopping center parking lot. (Tr. 19, 22, 25-26, 30). DTFO Jacobi, clad in a ballistic vest with "Police" on the front, drew his weapon and moved around to the front of the minivan where both occupants had rolled their windows down. (Tr. 24, 26). Because it was apparent that both men did not speak English and DTFO Jacobi did not speak Spanish, DTFO Jacobi said, "dos manos," meaning two hands, so that he could see the individuals' hands. (Tr. 26). DTFO Jacobi kept his weapon drawn for three minutes until other officers arrived on the scene. (Tr. 27, 87). Once there were enough officers to cover DTFO Jacobi, he holstered his weapon, opened the door to the minivan, and asked Defendant, who was the driver, and a passenger, to step out of the vehicle. (Tr. 27, 32). DTFO Jacobi then waited for approximately ten minutes for DEA Task Force Officer David Aguilar ("DTFO Aguilar"), who fluently speaks Spanish, to arrive. (Tr. 27-28, 38, 72).

When DTFO Aguilar arrived on the scene, Defendant was seated on a curb without any agents standing over him. (Tr. 74). DEA Supervisory Special Agent Keith Cromer ("SA Cromer") arrived on the scene wearing a suit and driving an unmarked Camaro, to speak with Defendant about the suitcase that had been placed in the Mustang earlier. (Tr. 33, 36, 46). SA Cromer joined DTFO Aguilar, who acted as an interpreter for Defendant and SA Cromer. (Tr. 38, 58, 72-74). SA Cromer engaged in a ten minute

5

conversation with Defendant.  (Tr. 57).  Through DTFO Aguilar, SA Cromer asked Defendant if he had any large sums of drugs, money, or illegal contraband, and Defendant replied that he did not. (Tr. 39).  SA Cromer then asked Defendant through DTFO Agular if he minded if the law enforcement officers searched the minivan and advised him that he could refuse consent. (Tr. 84-85).  Defendant told him to go ahead. (Tr. 39, 75, 84-85).  After a minute or two of searching, agents determined that there was no contraband in the minivan.  (Tr. 39).

SA Cromer then asked Defendant if he had any large sums of money, drugs, or illegal contraband at his residence, and Defendant said he did not. (Tr. 40).  SA Cromer asked Defendant did he mind if the law enforcement officers went back to his residence to search it, and Defendant stated that he did not.  (Tr. 40).  DTFO Aguilar advised Defendant that he could refuse to give his consent. (Tr. 76, 84-85).  Defendant told SA Cromer that he could search the residence.  (Tr. 40, 76).  When Defendant gave his consent, the conversation between Defendant and SA Cromer had a courteous, casual tone, law enforcement officers did not draw weapons on him, no intimidation was occurring, Defendant was standing and was not wearing handcuffs, and the only officers present next to Defendant were SA Cromer and DTFO Aguilar.  (Tr. 40, 41, 75-76, 99). At the time, the law enforcement officers present had two marked vehicles and three unmarked vehicles.  (Tr. 61).  Defendant was not threatened or promised anything in exchange for his consent.  (Tr. 42, 98-99).  Defendant was coherent, did not appear to suffer from any disabilities, appeared to understand what was being said to him, and

6

responded in a manner consistent with what was being said to him.  (Tr. 43).

SA Cromer asked Defendant if Defendant wanted to ride with him back to the house.  (Tr. 41, 104).  SA Cromer testified that Defendant said, "Yes, yes, I will go back to the house with you," but asked whether the law enforcement officers would bring him back to his minivan when they completed their search because there was no contraband in his house.  (Tr. 41, 104).  SA Cromer told Defendant that he would bring Defendant back to the minivan.  (Tr. 41).  The passenger of the minivan, who did not live at the residence, elected to stay at the shopping center.  (Tr. 41).  Defendant then walked over to and entered the front passenger side of SA Cromer's Camaro and put on his seatbelt.  (Tr. 42, 77, 99).

Defendant's version of events differs.  Defendant testified that when DTFO Jacobi was no longer pointing his gun at him, Defendant still did not believe he was free to leave because he thought that he was already under arrest, and DTFO Aguilar had shut Defendant's car off and kept Defendant's keys to the minivan.  (Tr. 88, 90-91, 95, 100, 103).  Defendant further testified that no one asked him for permission to search his car.  (Tr. 88, 98).  Defendant admits that the law enforcement officers asked for permission to search his house and that he lent his consent; however, Defendant asserts that he was not told that he could refuse consent, and did not think he could refuse his consent.  (Tr. 88-89, 98).  Defendant also asserts that when he asked whether he could take his van back to the house he was told no.  (Tr. 89-90).

7

### C.   Search of the Chapel Hill Residence

After a less than ten minute drive, SA Cromer parked his Camaro near 1446 Chapel Hill Lane. (Tr. 43-45, 64, 99). SA Cromer and Defendant exited the vehicle and were met by DTFO Aguilar and one other agent. (Id.). SA Cromer followed another agent to Defendant's residence and other agents arrived at the residence in at least two more vehicles. (Tr. 63). The agents and Defendant were met at the door by Defendant's wife. (Tr. 45, 64). SA Cromer through DTFO Aguilar explained to Mrs. Maldonado that the agents were with the DEA and that they were following up on a drug investigation. (Tr. 45). The officers asked Mrs. Maldonado to identify herself and confirmed that she lived at the residence. (Tr. 45). Because Mrs. Maldonado lived at the residence, SA Cromer, speaking through DTFO Aguilar, asked in Spanish for and obtained Mrs. Maldonado's consent to search the residence. (Tr. 45-46, 78). The agents' weapons were not drawn at the time, they took no action to intimidate the Maldonados, they had no physical contact with Defendant, and the tone of their interaction was conversational. (Tr. 46, 78-79). SA Cromer told Defendant that no one was under arrest and that there was no warrant for his arrest, but never explicitly told Defendant that he was free to leave. (Tr. 66). The Maldonados did not give any indication that they did not want agents to search the residence. (Tr. 46).

While agents were searching the residence, SA Cromer asked Defendant if there was an area where they could talk. (Tr. 47). Defendant led SA Cromer, DTFO Aguilar, Agent Tony Smith, and DTFO Cloninger to the back patio of the residence. (Tr. 47, 68,

8

79, 84).   In order to establish a rapport with Defendant, SA Cromer explained that Defendant's name had come up during the course of an investigation and made small talk with him.  (Tr. 47-48).  During the course of the discussion, other agents pulled SA Cromer aside and showed him a couple of large, military-style rifles and handguns they found in the garage and other weapons they found in the attic above the master bedroom. (Tr. 49, 69).  SA Cromer then returned to Defendant and DTFO Aguilar and explained to DTFO Aguilar that the agents found several weapons and directed DTFO Aguilar to read Defendant his <u>Miranda</u> warnings.  (Tr. 50).

DTFO Aguilar read Defendant his <u>Miranda</u> warnings in Spanish.  (Tr. 51).  DTFO Aguilar also placed a card with the <u>Miranda</u> warnings translated in Spanish next to Defendant so that Defendant could read it while DTFO Auilar read Defendant his rights. (Tr. 81).  DTFO Aguilar instructed Defendant to let him know whether he understood his rights as they were read.  (Tr. 81).  After every right was read, DTFO Aguilar asked Defendant if he understood, and the Defendant replied "yes."  (Tr. 81).  DTFO Aguilar read in Spanish:

> Before we ask you any questions, you must understand you have the right to remain silent.  Anything you say can be used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.  If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. Do you understand?  Are you willing to answer some questions?

(Tr. 81-82).  Defendant said "yes" in response.  (Tr. 82).  Defendant appeared to understand DTFO Aguilar, and admits that he did understand DTFO Aguilar.  (Tr. 51, 82, 101).  Defendant also admits that he understood the warnings to mean that he had

the right to remain silent, that anything he said could be used against him, and that he could ask for an attorney.  (Tr. 94, 101-02).

Before asking Defendant any questions, SA Cromer advised Defendant that if there were any questions that he did not understand or felt uncomfortable answering, he did not have to answer those questions and he could let them know if he did not understand. (Tr. 51).  Defendant "acknowledged that he understood and he didn't have a problem."  (Tr. 52).  In response to SA Cromer's questioning, Defendant denied having any knowledge of the weapons, handguns, and drug trafficking activity. (Tr. 52). Defendant did mention that he rented a room with his family at the 1446 Chapel Hill address and talked about his status in the United States.  (Tr. 83).  SA Cromer told Defendant about the weapons agents located within the house, and advised Defendant that if he was in the United States illegally, he could not possess weapons and could be facing some kind of criminal penalty.  (Tr. 53).  SA Cromer also told Defendant that if he agreed to cooperate, anything that he discussed would be made known to the prosecutor handling the case.  (Tr. 53).  SA Cromer also told Defendant that he had a wife and kids and indicated that he was showing more loyalty to the people distributing drugs than to his own family.  (Tr. 53).  According to SA Cromer, Defendant responded that Mrs. Maldonado knew what she was getting into when she married him, that he was not going to worry about them, and that they were not going to worry about him.  (Tr. 54).  At some point, Defendant commented, "Hey, man, if there is any drug information or drug activity that I am affiliated with, just let me do my jail time" and asked for his

10

attorney. (Tr. 83). SA Cromer ended the conversation. (Tr. 54). This conversation took place while SA Cromer and Defendant were seated on furniture in the patio in Agents Aguilar and Cloninger's presence. (Tr. 54). No one threatened Defendant, intimidated him, used abusive tones with him, attempted to trick him into talking, drew weapons on him, or made him promises as to what a court or prosecutor might do if he made statements. (Tr. 55, 71, 82-83, 98-99, 101). Defendant never asked to leave the residence. (Tr. 55).

Again, Defendant's version of the story is different, but the Court does not find it credible. Defendant asserts that his sister-in-law, not his wife, greeted agents at the door of the Chapel Hill residence and that the officers did not ask his wife's permission to search the residence. (Tr. 90-91, 100, 103). Instead, the law enforcement officers rushed into the residence and took him to the back porch. (Id.). According to Defendant, upon reaching the back porch, the officers asked him questions about people and whether he knew them, and that the officers did not read him his Miranda warnings until after he already talked to them. (Tr. 91-92). Defendant alleges none of the officers told him that he did not have to answer their questions or that he was free to leave. (Tr. 92). Defendant also testified that he has a sixth grade education from Mexico and that he was not taught about American laws. (Tr. 93-94).

## II.   DISCUSSION

Defendant argues in his Motions to Suppress that evidence obtained from the search of his residence should be suppressed because (1) the Terry stop of his minivan

11

was not justified by reasonable suspicion and amounted to an unlawful arrest and detention; (2) Defendant's consent to the officers' warrantless search of his minivan and residence was a mere uninformed, involuntary acquiescence to the officers' show of authority during a time when he did not feel free to leave; and (3) Defendant's consent to the officers' warrantless search of his residence was tainted by the illegal Terry stop and the involuntary consent to the search of the minivan.

### A.   The Stop of the Minivan was Justified by Reasonable Suspicion

Defendant contend that the stop of his minivan was not justified by reasonable suspicion and amounted to an unlawful arrest and detention.  In support, Defendant argues the search for the suitcase was not justified by reasonable suspicion because there was no direct evidence linking the suitcase to Defendant, illegal activity, or contraband. Defendant also argues he was subjected to an unreasonable detention because the minivan had not committed any traffic offense, yet its path was blocked, DTFO Jacobi held Defendant at gunpoint until at least three other officers arrived, four officers were present while Defendant was detained for a lengthy period, and the officers took Defendant's keys away from him.  The Government argues in response that the traffic stop of the minivan was justified by reasonable suspicion because the law enforcement officers not only believed Defendant to be speaking directly with sources of narcotics supply in Mexico but also agents observed the exchange and placement of a suitcase, which is often utilized by drug organizations to transport drugs and drug money, within a Mustang, whose passenger and driver looked around and made quick turns consistent

with counter-surveillance measures and ended up in the driveway of Defendant's residence.  Although the suitcase was not found within the Mustang, agents observed the blue minivan depart from the same residence.

The police may stop a car and briefly detain it and its occupants in order to investigate a reasonable suspicion that such persons are involved in criminal activity if the stop is reasonably related in scope to the circumstances which justified the stop. Terry v. Ohio, 392 U.S. 1 (1968); United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009); United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004); United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990).  The police officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion" under the totality of the circumstances.  United States v. Bautista-Silva, 567 F.3d 1266, 1272 (11th Cir. 2009); Tapia, 912 F.2d at 1370 (citing United States v. Sokolow, 490 U.S. 1 (1989)).  Officers are expected to use their experience and specialized training to draw inferences from the cumulative information available to them, including inferences that may evade untrained observers.  United States v. Bautista-Villanueva, 524 F. App'x 476, 478 (11th Cir. 2013).  The court "may not consider each fact only in isolation and reasonable suspicion may exist even if each fact 'alone is susceptible of innocent explanation'" and even if the suspicion ultimately turns out to be incorrect.  Bautista-Silva, 567 F.3d at 1272; Bautista-Villanueva, 524 F. App'x at 478.  "Such facts may be derived from 'various objective observations, information from police reports, if such are available, and

13

consideration of the modes or patterns of operation of certain kinds of lawbreakers.'" United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989).

Under the totality of the circumstances of this case, the agents possessed reasonable suspicion to stop the minivan because it appeared as if drug-related activity may have been occurring. Based on the behavior of the men loading the suitcase into the Mustang, it was reasonable for law enforcement officers to believe that the suitcase carried drugs, money, or other contraband. Based on DTFO Cloninger's training and experience, he believed that suitcases are a common concealment method for drugs and money because suitcases may be moved freely in public without drawing suspicion. (Tr. 15). Prior to the stop, DTFO Cloninger observed two men load a single, heavy suitcase into a grey Ford Mustang parked near what law enforcement officers believed to be a stash house for storing drugs or money. (Tr. 11-15). A reasonable inference was that the suitcase did not contain clothes for travel because it appeared to be very heavy and the two men had no other luggage. (Tr. 15). The Mustang was associated with Defendant, who agents believed, based on information gathered during intercepted phone calls, to be a multi-kilogram distributor of methamphetamine and cocaine, a source of supply, with multiple people working at his direction, and who communicated directly with leaders in Mexico. (Tr. 13, 15). Additionally, the occupants of the Mustang's behavior was consistent with counter-surveillance. Not only did the two men look around while they were loading the suitcase into the Mustang, but they also waited several minutes after DTFO Cloninger drove by to leave the parking lot and once in

14

route, the men in the Mustang were looking around and made a couple of quick turns. (Tr. 16, 21). According to DTFO Cloninger, this is typical counter surveillance behavior because looking around and making turns quickly and unexpectedly helps officers detect whether others are following. (Tr. 16). The Mustang was subsequently observed parked in the driveway of 1446 Chapel Hill Lane, which, based on previously collected GPS data, agents believed was frequented by Defendant. (Tr. 16-17). When law enforcement officers subsequently stopped the Mustang, however, they did not find any contraband within the Mustang. (Tr. 17).

Given that the suitcase was not found in the Mustang, it was therefore, reasonable for the law enforcement agents to suspect that the blue minivan leaving the Chapel Hill residence could have the suitcase with contraband inside.[1] (Tr. 17, 25, 37). The minivan was associated with and was being driven by Defendant, who agents believed, based on information gathered during intercepted phone calls, to be a multi-kilogram distributor of methamphetamine and cocaine. (Tr. 15, 19, 25, 37). The minivan was seen leaving the Chapel Hill residence, which agents believed to be associated with Defendant and was the location where the Mustang originally carrying the suitcase had just been. (Tr. 17, 25, 37).

The facts of this case are similar to <u>United States v. Gopie</u>, 347 F. App'x 495 (11th Cir. 2009), where the Eleventh Circuit concluded that the agent had reasonable suspicion to search a vehicle when the DEA received an anonymous tip that a suspect

---

[1]   All of the law enforcement officers and agents were sharing information throughout the day. (Tr. 19-20).

15

was involved in an interstate drug trafficking operation, the DEA confirmed the suspect's identity and verified that he had a prior conviction for drug trafficking, agents observed the suspect carrying heavy-appearing crates from a U-Haul truck to a residence, and then trash bags which appeared to be heavy from the residence into an Infiniti. Id. at 498. Next, the agents observed the U-Haul and the Infiniti leave the residence together, pull up next to each other to converse, and split apart. Gopie, 347 F. App'x at 498. Then the agents observed the Infiniti engage in counter-surveillance measures. Id. at 498. In this case, just as in Gopie, law enforcement officers believed based on intercepted calls that Defendant was a drug dealer, knew that Defendant was affiliated with both the Mustang and the minivan, observed the transfer of the suitcase into the Mustang, which reasonably appeared to be drug-related activity, observed the Mustang appear to engage in counter-surveillance efforts, did not find the suitcase when searching the Mustang, observed the minivan departing from the location from which the Mustang had departed prior to the search, and observed Defendant driving the minivan. Under the totality of the circumstances, it was reasonable for the law enforcement officers to suspect that the minivan was carrying contraband. Gopie, 347 F. App'x at 498-500; see also United States v. Bryant, 334 F. App'x 259, 263 (11th Cir. 2009) (concluding that police officer's stop of car was justified by reasonable suspicion where police officer observed two vehicles abruptly depart after police officer approached and vehicles had been stopped in middle of road next to each other and pointing in opposite directions in area known for drug transactions); United States v.

16

Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006) (holding that detective possessed reasonable suspicion that contraband was removed from a residence to support stop of Mercedes and truck leaving residence because residence was believed to be a grow house, law enforcement observed one individual carry a black garbage bag out of the residence and place the garbage bag into the truck and a second defendant carry a cardboard box from the residence, place it into the Mercedes, and step into the Mercedes); United States v. Powell, 222 F.3d 913, 917, 918 (11th Cir. 2000) (concluding that officers had reasonable suspicion that something related to drug trafficking occurred where defendant and her friend drove to house of known drug trafficker, defendant went into the garage with a backpack, defendant left with the backpack and returned to the passenger seat of car, the friend drove her through neighborhood, defendant returned to the house with the backpack, defendant left the backpack at the house after entering the garage, and defendant drove away in the car).

## B. **Duration of the Stop**

Contrary to Defendant's argument, his detention after the stop did not amount to an arrest requiring probable cause. Defendant argues he was subjected to an unreasonable detention that amounted to an illegal arrest because the minivan had not committed any traffic offense, yet its path was blocked, DTFO Jacobi held Defendant at gunpoint until at least three other officers arrived, four officers were present when Defendant was detained for a lengthy period, and the officers took Defendant's keys away from him. In addition, Defendant argues that once the officers searched the

17

minivan and the search yielded no contraband, Defendant should have been free to leave, but SA Cromer questioned Defendant about a new topic and obtained his consent to search the Chapel Hill residence.

There is a difference between an investigative stop of limited duration for which reasonable suspicion is enough, and a detention that amounts to an arrest for which probable cause is required. United States v. Acosta, 363 F.3d 1141, 1145-46 (11th Cir. 2004). In determining whether a detention rises to the level of an arrest, the court weighs a limited violation of individual privacy against the opposing interests in crime prevention, detection, and police officer safety. Acosta, 363 F.3d at 1145-46. Four factors are considered: (1) the law enforcement purposes served by the detention; (2) the diligence with which the police pursued the investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention.

When evaluating whether law enforcement purposes were served by the detention, the court considers whether police detained the defendant to pursue a method of investigation that was likely to confirm or dispel suspicions quickly and with a minimum of interference. Acosta, 363 F.3d at 1146. Under the second factor, the court considers whether the police were diligent in pursuing their investigation, that is, whether the methods the police used were carried out without unnecessary delay. Acosta, 363 F.3d at 1146. Under the third factor, the court evaluates whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety. Acosta, 363 F.3d at 1146. The Supreme Court has stated that officers

18

may take reasonable steps to ensure their safety so long as they possess "an articulable and objectively reasonable belief that the suspect is potentially dangerous." Acosta, 363 F.3d at 1146. Thus, an investigatory stop does not necessarily ripen into an arrest merely because the officer draws his weapon, handcuffs a suspect, orders a suspect to lie face down on the ground, or secures the suspect into the back of a patrol car. Acosta, 363 F.3d at 1147. Under the fourth factor, there is no rigid time limitation or bright line rule regarding the duration of a Terry stop. Acosta, 363 F.3d at 1147. The question is one of common sense and early human experience. Acosta, 363 F.3d at 1147.

In this case, the stop did not ripen to an arrest. First, the law enforcement officers engaged in investigatory methods that would quickly confirm or dispel suspicions with minimal interference and were dedicated to the purpose for the stop. Defendant was stopped that day because law enforcement officers were trying to locate the suitcase that was previously placed in the Mustang which they believed contained money or drugs. (Tr. 37-38). After DTFO Aguilar and SA Cromer arrived, they asked Defendant questions fully within the scope of the investigation and asked for his permission to search the vehicle. (Tr. 25, 39). Upon learning that no contraband was in the minivan, SA Cromer asked a few other questions relating to the purpose of the stop, such as whether Defendant had illegal contraband or large sums of money at his residence. (Tr. 40). The search of the minivan only took a couple of minutes and only ten minutes passed between the time that SA Cromer arrived on the scene and the time that SA Cromer left with Defendant to search the Chapel Hill residence. (Tr. 39, 62). Clearly,

19

the brief questioning and the even briefer search both fully pertained to the purpose of the stop and were designed to confirm or dispel the law enforcement officers' suspicions quickly.

Additionally, despite some show of authority, the stop was conducted with minimal interference and intrusion.  Although DTFO Jacobi drew his weapon on Defendant and his passenger and insisted that they put their hands in the air, as soon as other backup units arrived, he holstered his weapon and asked Defendant and the passenger to step out of the minivan and waited ten minutes for DTFO Aguilar and SA Cromer to arrive.  (Tr. 26-27).  The few minutes that DTFO Jacobi waited for the other backup officers to arrive on the scene while keeping Defendant and the passenger at gun point was reasonable.  DTFO Jacobi was the only law enforcement officer at the scene, the officers knew that in the past the individuals in the organization carried weapons, and the officers suspected that a suitcase containing contraband may be aboard the minivan.  (Tr. 23, 27, 37-38); Acosta, 363 F.3d at 1147 (concluding that it was reasonable for the officers to protect themselves during the course of the stop without the stop transforming into arrest because the officers reasonably suspected that the defendant was carrying a large amount of money in his car and that he might have a weapon to protect himself and the money).  Instead of prolonging the offensiveness of the intrusion, as soon as the backup officers arrived on the scene, DTFO holstered his weapon.  (Tr. 27).  Although Defendant avers that the officers also took his keys from him, this Court does not find Defendant's testimony credible.  Instead, this Court finds

20

Defendant's testimony contradictory. Defendant first testified that the keys stayed in his van, not that DTFO Jacobi took his keys and kept them. (Tr. 90, 103). Nevertheless, even if DTFO held Defendant's keys during the course of the stop, this Court cannot conclude that doing so amounted to an arrest. The very nature of a <u>Terry</u> stop includes stopping the suspect and preventing him or her from leaving; thus, an investigatory stop is not an arrest just because the suspect is prevented from leaving. <u>Acosta</u>, 363 F.3d at 1145-47.

Furthermore, the officers diligently pursued the investigation. Each investigatory act of the law enforcement officers logically led to the next act which was done without delay. <u>United States v. Williams</u>, 238 F. App'x 566, 568 (11th Cir. 2007) (explaining that under the second factor, the Eleventh Circuit has found that the police acted diligently where each investigatory act by the police logically led to the next act which was done without delay). Because law enforcement was looking for a suitcase with contraband in it, it was logical for them to ask about the presence of contraband within the minivan and to request to search the minivan. When no contraband was found in the minivan, a logical progression of the investigation was to ask whether there was contraband in the Chapel Hill residence, where both the minivan and the Mustang had been, and to ask Defendant for his consent to search it. Although DTFO Jacobi briefly delayed the investigation while he waited for DTFO Aguilar to arrive, the delay was reasonable and served the purpose of the investigation. Because Defendant and his passenger both spoke Spanish, no officer on the scene fluently spoke Spanish, it was

21

apparent to DTFO Jacobi that neither the Defendant nor the passenger spoke English, and the investigation logically could not proceed until Defendant and his passenger could understand the investigating officers' attempts to communicate with them.  (Tr. 26-28).  Even with the brief delay resulting from the back up officers and DTFO Aguilar's arrival, the Defendant was detained less than ten minutes prior to DTFO Aguilar arriving on the scene.  (Tr. 29).  The total duration of the stop was not excessive as it appeared to be approximately twenty minutes.  (Tr. 29, 39, 62); see United States v. Lester, 477 F. App'x 697, 701 (11th Cir. 2012) (holding that thirty to forty minute duration of the detention was not unreasonable); Acosta, 363 F.3d at 1148 (concluding that a thirty minute stop was not unreasonable for a Terry stop).   Under these circumstances, this Court concludes that the traffic stop did not blossom into an arrest. See, e.g., United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000) (concluding that detention during Terry stop was not an arrest even where stop lasted seventy-five minutes, police searched the defendant's car, the defendant was handcuffed, placed in the back of a police car, and taken to her residence).

### C.   Consent to Search the Minivan and Chapel Hill Residence

Defendant contends that his consent to search the minivan and residence was not voluntary and instead Defendant yielded to a show of authority by the law enforcement officers because he did not think he had the option to refuse.  In support, Defendant argues his consent was procured at a time when he reasonably believed he was not free to leave, DTFO Jacobi had held him at gun point for three minutes, the law enforcement

22

officers at the scene had "direct control over his actions and movements," his car keys were taken away from him, and he was an uneducated, undocumented alien surrounded by multiple armed agents.  Defendant also contends that his consent to search his home was given after his coercive detention, without his understanding that he could refuse to give consent, and he was required to accompany SA Cromer to the residence. Defendant further argues his consent was also tainted by the illegal stop of the minivan and his unlawful arrest.

This Court concludes that Defendant voluntarily gave his consent for the search of the minivan and the residence.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). An exception to the requirement that law enforcement obtain a warrant to search a person's residence is when consent is given by an individual possessing authority to do so.  Ga. v. Randolph, 547 U.S. 103, 106 (2006), citing Schneckloth, 412 U.S. at 222. "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice" and "not the result of duress or coercion, express or implied" or the acquiescence to a claim of lawful authority.  Am. Fed'n of State, Cnty. and Mun. Emp. Council 79 v. Scott, 717 F.3d 851, 874 (11th Cir. 2013);

Acosta,363 F.3d at 1151; United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995).  The principles for determining the voluntariness of consent for a search are the same as those for determining the voluntariness of a confession--i.e. whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances.  See Johnston v. Tampa Sports Auth., 530 F.3d 1320, 1326 (11th Cir. 2008), cert. den'd, 555 U.S. 1138 (2009); Tovar-Rico, 61 F.3d at 1535.  Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his or her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found.  Schneckloth, 412 U.S. at 226; Johnston, 530 F.3d at 1326; United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999).  Ultimately, the burden is on the Government to prove the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.  United States v. Schmitz, 469 F. App'x 772, 773 (11th Cir. 2012); United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir. 1993).

In this case, Defendant's consent was voluntarily given.  Contrary to Defendant's argument, the consent to search was not tainted by the prior traffic stop or an unlawful arrest because, as discussed above, the stop of the minivan was legal and the stop did not blossom to an arrest.  Second, this Court does not agree that Defendant's consent was the mere acquiescence to the show of authority by law enforcement officers at the scene.  Although DTFO Jacobi initially pointed his weapon at Defendant for a three-minute

24

period, DTFO Jacobi ultimately holstered his weapon, no one else pointed weapons at Defendant, and Defendant was not handcuffed at any point during the stop or at the Chapel Hill residence.  (Tr. 40-41, 74, 98).   After the initial show of authority, Defendant's subsequent movements were not controlled.  When DTFO Aguilar arrived, Defendant was seated on a curb without any agents standing over him, and no physical contact with Defendant occurred.  (Tr. 40-41, 45, 71, 74-79, 99).  Although eight officers were present on the scene, at the time Defendant lent his consent, only DTFO Aguilar and SA Cromer were with Defendant and no other agents were hovering near Defendant.  (Tr. 36, 40, 61).  While Defendant testified that SA Cromer took away his keys, would not let him take his own car to his residence, and insisted that Defendant ride with him over to the residence, this Court does not credit Defendant's testimony in this regard.  Instead, this Court finds SA Cromer's testimony about the matter to be credible.  SA Cromer testified that he offered Defendant the choice of riding with him to the Chapel Hill residence, SA Cromer did not take away Defendant's keys, Defendant voluntarily indicated that he wanted to ride with SA Cromer, Defendant entered SA Cromer's Camaro of his own accord, and Defendant put the passenger side seatbelt on himself. (Tr. 41-42, 77, 104-05).  Additionally, this Court credits Defendant's original testimony that the keys to the minivan remained in the minivan. (Tr. 90, 102).  Even if Defendant was not free to leave at the time he gave his consent, that factor is not dispositive–the standard for determining voluntariness is the same whether Defendant was in custody, under arrest, or merely stopped at the time of consent.  United States v.

25

Perry, 522 F. App'x 821, 826 (11th Cir. 2013); United States v. Espinosa-Orlando, 704 F.2d 507, 512 (11th Cir. 1983).  The issue is whether Defendant believed that he was free to refuse consent.  Perry, 522 F. App'x at 826; Espinosa-Orlando, 704 F.2d at 512.

Based on this record, it is apparent that Defendant was aware that he could refuse to give his consent for the searches of both the minivan and his residence.  Although Defendant contends that no one told him that he can refuse consent, this Court finds DTFO Aguilar's testimony credible wherein he testified that consistent with his practice, he told Defendant that he could refuse to consent to the search of his minivan and his residence at any time. (Tr. 84-85).  Despite Defendant's contention that he was unaware of his rights because he only had a sixth grade education from Mexico and was not educated about the criminal system in the United States, the record supports the notion that Defendant understood his rights.  Not only did Defendant appear to understand DTFO Aguilar when he told him that he had the right to refuse his consent, but consistent with the notion that Defendant was able to understand what his situation was and what the law enforcement officers were telling him, Defendant has also testified that he understood everything that was going on in the proceedings before this Court during the suppression hearing.  (Tr. 101).  Moreover, Defendant was no stranger to the criminal justice system given that he was incarcerated for sixth months for crossing the border and coming into the United States with his brother's identification.  (Tr. 96-97).  Furthermore, Defendant unequivocally gave his consent.  Defendant did not hesitate before giving his consent to search the Chapel Hill residence, did not give any indication

26

that he did not want to consent, and consented again once agents arrived at his residence. (Tr. 76, 78).

Finally, Defendant was not subjected to any coercive law enforcement procedures. SA Cromer and DTFO Aguilar did not threaten Defendant, make him any promises, or use abusive tones with him. (Tr. 41-43, 75). DTFO Aguilar and SA Cromer spoke with Defendant in a conversational and polite tone. (Tr. 40-41, 74, 99). Under these circumstances, this Court concludes that Defendant's consent to search both the minivan and the Chapel Hill residence was voluntary. United States v. Peguero, 518 F. App'x 792, 795 (11th Cir. 2013) (holding that even though officer did not explicitly tell defendant he could refuse consent to a search, consent was still voluntary given that defendant freely conversed with the officer, laughed and made small talk, was cooperative and polite and the officer did not display a gun, did not handcuff or physically restrain him, did not threaten him, and did not imply that there were consequences for refusing the search); United States v. Butler, 102 F.3d 1191, 1197 (11th Cir. 1997) (finding that consent was voluntary even though arresting officers had stationed other officers around the perimeter of the house in order to prevent its occupants from leaving because [resident] opened her door voluntarily, was informed that she could refuse the search, signed a consent form, and was cooperative); Hidalgo, 7 F.3d at 1570-71 (holding that consent given following defendant's arrest at gunpoint and invocation of the right to remain silent was voluntary); United States v. Garcia, 890 F.2d 355, 362 (11th Cir. 1989) (concluding that the presence of fourteen officers in

defendant's home following defendant's arrest did not show that his consent was obtained involuntarily where there was no indication that they were all in the same room with defendant when he consented or acted in a coercive manner).

### D.   Voluntariness of Defendant's Statements

Defendant further contends that statements he made to SA Cromer and DTFO Aguilar at his home should be suppressed because they were not voluntarily made. Specifically, Defendant argues his statements were involuntary because his statements followed the stop of his vehicle, he was denied access to his vehicle, prevented from leaving, subjected to a prolonged detention, taken to his home, and was questioned at his home where there were multiple officers and a police dog. Defendant maintains that these circumstances were especially coercive because he had limited education, experience, and cultural knowledge and was given little explanation of the rights he was abandoning.

The Fifth Amendment of the United States Constitution prohibits the use of an involuntary confession against a defendant in a federal criminal trial. U.S. Const. amend. V; Dickerson v. United States, 530 U.S. 428, 433 (2000); Bram v. United States, 168 U.S. 532, 542 (1897). In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court recognized the need to further safeguard the privilege against self-incrimination by requiring that Miranda warnings, or other fully effective means, be given to subjects of custodial interrogations. Miranda, 384 U.S. at 478-79; see also Dickerson, 530 U.S. at 442-43 (rejecting Congress's attempt through 18 U.S.C. § 3501 to reinstate the totality

28

test as sufficient).  The "Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  A defendant may waive his Miranda rights "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.  The waiver inquiry is two-pronged.  "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).  "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." N.C. v. Butler, 441 U.S. 369, 373 (1979); see also United States v. Beckles, 565 F.3d 832, 840 (11th Cir. 2009) (same).

In this case, Defendant freely waived his Miranda rights and made statements with full knowledge of the rights he was waiving.  First, when Defendant waived his rights, he was aware of the nature of the rights being abandoned and the consequences of the decision to abandon it.  DTFO Aguilar fully apprized Defendant of his rights before he started Defendant's interrogation.  Prior to the interrogation,[2] DTFO Aguilar read

---

[2] Defendant intimates that he was questioned both before and after receiving his Miranda warnings. (Def.'s Br., Doc. 207, 13).  SA Cromer testified that he asked questions of Defendant such as how many children Defendant had before giving Defendant his Miranda warnings. (Tr. 47-48).  Even if SA Cromer's actions in doing

Defendant his <u>Miranda</u> rights in Spanish and allowed him to read along from a card with them. (Tr. 81). Defendant was notified that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to talk to a lawyer for advice before questioning and to have a lawyer present during questioning, and that a lawyer could be appointed for him if he could not afford one. (Tr. 81-82). Defendant was also told that if there was any question that made him feel uncomfortable or that he could not understand, he did not have to answer. (Tr. 51). Defendant appeared to comprehend what DTFO Aguilar was saying about his rights, Defendant admits that he understood the warnings to mean that he had the right to remain silent, that anything he said could be used against him, and that he could ask for an attorney. (Tr. 94, 101-02). Thus, this Court concludes that Defendant had the capacity to understand his rights as explained to him by DTFO Aguilar, and he understood his rights. DTFO Aguilar then asked Defendant if he was willing to answer some questions, and Defendant indicated that he was. (Tr. 82).

    Second, Defendant voluntarily waived his <u>Miranda</u> rights without being subjected

---

so could be considered interrogation triggering the duty to give <u>Miranda</u> warnings, Defendant does not identify any specific questions directed to him or any statements made prior to the time that DTFO Aguilar read his <u>Miranda</u> warnings to him that should be suppressed. <u>United States v. Jules</u>, 244 F. App'x 964, 973 (11th Cir. 2007) (questions as to why defendant was laughing were not interrogation but rather casual conversation); <u>United States v. Richardson</u>, 764 F.2d 1514, 1527 (11th Cir. 1985) (holding that "[a] motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented" and "must allege facts which, if proven, would provide a basis for relief"). Furthermore, the Government concedes that it does not intend to introduce in its case-in-chief any statements made by Defendant prior to the waiver of his <u>Miranda</u> rights.

to intimidation, coercion, or deception and spoke to DTFO Aguilar and SA Cromer.  The circumstances of the investigation were not coercive.  Defendant was not being ordered to do anything, there was no physical contact with Defendant, he was not handcuffed or restrained in any way, and Defendant chose the area where the agents could talk to him. (Tr. 77-79).  Furthermore, no one intimidated or threatened Defendant, no one made promises as to what a prosecutor might do based on Defendant's statements or answers, and no one played tricks on him.  (Tr. 55, 83).  Under the totality of the circumstances, this Court concludes that Defendant knowingly, intelligently, and voluntarily waived his Miranda rights and provided statements to SA Cromer and DTFO Aguilar.

## MOTIONS TO SUPPRESS INTERCEPTED COMMUNICATIONS

Defendant contends that evidence obtained as a result of wiretaps authorized on target telephones four and six should be suppressed.  In support, Defendant argues probable cause did not support the interception of his calls to target telephone four, the Government did not demonstrate necessity for the interception of the target telephones, and the Government failed to minimize interception of communications not subject to interception.  As a result Defendant seeks to suppress all evidence obtained as a result of the wiretaps as well as the fruits of the evidence.  Defendant also requests a Franks hearing to determine the full extent of information gathered from the cooperation of confidential sources and for the Government to show how they exhausted the conventional means of investigation before seeking a wiretap.

31

## I.   BACKGROUND

### A.   Judge Jones' December 30, 2011 Wiretap Order: Target Telephone 4

In 2011, the DEA was conducting an investigation into what they believed to be a Mexico-based drug trafficking and money laundering organization based out of Mexico. (Gov't's Attachment. A, Aff. of Mara Hewitt, hereinafter "Hewitt Aff.," ¶¶ 24). In connection with that investigation, on December 30, 2011, U.S. District Court Judge Steve Jones issued an Order permitting the DEA to intercept a cellular telephone number, referred to as Target Telephone 4 (hereinafter "TT4"), believed to be used by an unidentified male known as "Perico" who was suspected of being a distributor of illegal drugs in the Atlanta, Georgia area. (Hewitt Aff. ¶ 18). The investigation was targeting conversations of five unidentified males, one of whom was known as Juan, as well as five other individuals. (Hewitt Aff. ¶ 18). DEA Special Agent Mara Hewitt ("SA Hewitt") indicated in the application for the wiretap on the target telephone that she believed interception of calls on TT4 would lead agents to information concerning the offenses by the target subjects of the investigation, including importation, distribution and possession of, with intent to distribute, controlled substances (marijuana, cocaine, and methamphetamine) in violation of 21 U.S.C. §§ 841, 952, 960; the unlawful use of communication facilities in committing or facilitating the commission of a Title 21 felony offense in violation of 21 U.S.C. § 843(b); the conspiracy to import, distribute, and possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846, 963; money laundering and conspiracy to

32

commit money laundering in violation of 18 U.S.C. §§ 1956, 1957; and aiding and abetting all of the aforementioned offenses in violation of 18 U.S.C. § 2. (Hewitt Aff. ¶¶ 19). In support of the Application, SA Hewitt provided her own affidavit in which she details several examples of what was believed to be drug trafficking activity by an individual known as Perico. (Hewitt Aff. ¶¶ 28-45). In addition, SA Hewitt's affidavit connected Perico to TT4. (Hewitt Aff. ¶¶ 33-45).

### B. Judge Thrash's January 26, 2012 Wiretap Order: Target Telephones 5-7

On January 26, 2012, U.S. District Court Judge Thomas Thrash issued an Order permitting the DEA to intercept three cellular telephone numbers, referred to as Target Telephone 5-7 (hereinafter "TT5, TT6, and TT7"). (Gov't's Attachment D). TT6 was believed to be used by Juan Macedo Maldonado, who, at the time, was suspected of being a source of supply and distributor of illegal drugs operating in North Carolina and the Atlanta, Georgia areas. (Gov't's Attachment D, Second Aff. of Mara Hewitt, hereinafter "Hewitt 2 Aff.," ¶ 11). The application for the wiretap indicated that the investigation was targeting the conversations of seven unidentified males, as well as five other individuals, including Juan Macedo Maldonado, over the target telephones. (Hewitt 2 Aff. ¶ 18). SA Hewitt indicated in the application that she believed interception of calls on TT5, TT6, and TT7 would lead agents to information concerning the same offenses targeted in the interception of TT4 as well as possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c) and the unlawful seizure, detention, and threat to kill, injure, and further detain another person

33

in order to compel another person to do an act, namely to give over United States currency as a condition for the release of the person detained in violation of 18 U.S.C. §§ 1201, 1203. (Hewitt 2 Aff. ¶ 19). In support of the Application, SA Hewitt submitted her affidavit connecting Juan Macedo Maldonado to drug trafficking activity and TT6 based on information gained during previously intercepted calls. (Hewitt 2 Aff. ¶¶ 34-37, 42-47).

## II.   DISCUSSION

### A.   Probable Cause

Defendant contends that evidence obtained as a result of the interception of TT4 should be suppressed because the application and affidavit supporting the order did not supply probable cause that he committed one or more of the subject offenses. Section 2518(3) of Title III requires that a wiretap order be supported by probable cause to believe that (1) an individual is committing, or has committed, or is about to commit an offense enumerated in 18 U.S.C. § 2516, (2) that particular communications concerning that offense will be obtained through use of the wiretap, and (3) the telephone to be intercepted is being used in connection with the commission of such offense. 18 U.S.C. § 2518(3). An application for a wiretap must be supported by the same probable cause necessary for a search warrant. United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990). Thus, the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability of finding evidence of a crime. Illinois v. Gates, 462 U.S. 213, 238 (1983);

34

United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999); United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994); Nixon, 918 F.2d at 900. "[P]robable cause deals 'with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Gates, 462 U.S. at 241; Miller, 24 F.3d at 1361.  "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Gates, 462 U.S. at 241; Miller, 24 F.3d at 1361; Nixon, 918 F.2d at 900.  The practical nature of the decision to issue a warrant "justifies 'great deference' upon review" and calls for upholding the issuing judge's findings "even in marginal or doubtful cases." Nixon, 918 F.2d at 900.

Defendant's view that the affidavit in support of the interception of TT4 must provide probable cause that he committed one or more of the subject offenses is without merit.  The Eleventh Circuit has already concluded that the Government does not have a duty to establish probable cause as to the interception of calls involving each possible interceptee named in an application for a wiretap order; the Government need only establish that there was probable cause that the telephone in question is being used in an illegal operation. United States v. Domme, 753 F.2d 950, 954 (11th Cir. 1985); see also United States v. Nunez, 877 F.2d 1470, 1473 n.1 (10th Cir. 1989); United States v.

<u>Degaule</u>, 797 F. Supp. 2d 1332, 1355 (N.D. Ga. 2011); <u>cf.</u> <u>United States v. Kahn</u>, 415 U.S. 143, 152-53 (1974) (holding that under 18 U.S.C. § 2518(1)(b)(iv) and 2518(4)(a), "when there is probable cause to believe that a particular telephone is being used to commit an offense, but no particular person is identifiable, a wire interception order may nevertheless, properly issue under the statute" and that "it necessarily follows that Congress could not have intended that the authority to intercept must be limited to those conversations between a party named in the order and others, since at least in some cases, the order might not name any specific party at all"). Thus, probable cause need not be provided for unnamed potential interceptees, either. <u>Domme</u>, 753 F.2d at 954 ("A wiretap application need not provide probable cause of criminal activity for each person named in an application, or even every resident of the place where the wiretap is sought.")

Thus, contrary to Defendant's view, the Eleventh Circuit has already concluded that law enforcement does not have to specifically provide probable cause for the interception of his communications within the application for authorization of interception of TT4. SA Hewitt's Affidavit only needed to provide probable cause that TT4 was being used for an illegal operation. Defendant does not argue that Hewitt's affidavit is deficient in this respect. Indeed, SA Hewitt's affidavit clearly describes the likelihood of the use of TT4 to conduct illegal drug activity. In SA Hewitt's affidavit, she details several examples of what was believed to be drug trafficking activity by Perico. (Hewitt Aff. ¶¶ 28-45). SA Hewitt also shows a pattern of Perico using his

telephone to conduct drug-related activity and periodically changing his cell phones, which Hewitt explains is typical for individuals involved with drug trafficking. (Hewitt Aff. ¶¶ 5, 9-11, 27-30, 32, 40-45). Finally, SA Hewitt's affidavit sufficiently connects Perico as the user of TT4. (Hewitt Aff. ¶¶ 40-45). Under these circumstances, there was probable cause to believe that interception of TT4 would yield evidence of the crimes enumerated in Hewitt's Affidavit.

### B. <u>Necessity</u>

Defendant also argues that the Government did not demonstrate necessity for the interception of TT4 and TT5-7 because the supporting affidavits did not contain a full and complete statement as to whether other investigative procedures have been tried and failed or why they are insufficient. Defendant maintains that all the application does is substitute Hewitt's belief that there is probable cause to believe that some suspects are engaged in criminal conduct with the requirement for the particularized necessity for a wiretap.

Title III permits a district judge to authorize a federal wiretap only when he or she determines, on the basis of the facts submitted by the applicant, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). This "necessity requirement" of 18 U.S.C. § 2518(3)(c) "is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed." <u>United States v. Miller</u>, 431 F. App'x 847, 853 (11th Cir. 2011); <u>United</u>

AO 72A
(Rev.8/82)

States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1986).  Therefore, an application for an order authorizing the interception of wire communications must give a full and complete statement as to whether or not other investigative procedures have been tried and failed and whether they reasonably appear to be unlikely to succeed if tried or to be too dangerous.  United States v. Carrazana, 921 F.2d 1557, 1564-65 (11th Cir. 1991). "The affidavit in support of a search warrant must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves. However, a comprehensive exhausting of all possible investigative techniques is not necessary before applying for a wiretap." Miller, 431 F. App'x 847, 853; United States v. De La Cruz Suarez, 601 F.3d 1202, 1214 (11th Cir. 2010); United States v. Alonso, 740 F.2d 862, 868 (11th Cir. 1984) ( "Section 2518 was not intended to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.").  The district court's determination of necessity is a finding of fact that will not be reversed unless "clearly erroneous," see United States v. Weber, 808 F.2d 1422, 1424 (11th Cir. 1987), and the judge to whom the application is made "is clothed with broad discretion in its consideration of the application." Alonso, 740 F.2d at 868-69.

    1.   TT4

In this case, SA Hewitt's affidavit adequately details the difficulties involved in the use of conventional techniques in order to achieve the goals of the investigation.

The affidavit explains that the goals of the investigation are to discover (1) all of the individuals in the organization; (2) the current locations of the targets of the investigation and their unidentified accomplices; (3) the present operations and scope of the drug trafficking activities of the organization in Atlanta and elsewhere; (4) the methods of importing and transporting narcotics from Mexico through Texas and other areas into Atlanta; (5) methods of disposing of the bulk currency proceeds of drug trafficking; (6) the current significant customers of the organization; (7) locations where members of the organizations store narcotics and drug proceeds; and (8) and to dismantle the organization by convicting the highest level supervisors and leaders and seizing their assets. (Hewitt Aff. ¶ 46). SA Hewitt's affidavit further details why less intrusive traditional investigatory methods are not sufficient to achieve the investigation's goals and notes several deficiencies of the investigatory efforts thus far. The affidavit explains that pen registers and toll analysis is insufficient as an investigative tool because it only provides agents with facts regarding the time, duration, and frequency of calls and does not reveal the contents of conversations. (Hewitt Aff. ¶¶ 64-66). Without the intercepts, agents cannot understand the significance of such communications. (Id.). Additionally, toll analysis and pen registers do not help obtain the target subject's identities because drug dealers commonly subscribe to telephone services using fictitious names in order to conceal their identities. (Hewitt Aff. ¶¶ 64). The affidavit further explains that the TT4 subscriber information only included a default address Sprint/Nextel uses for prepaid phones with no billing address, and the

39

subscriber information failed to reveal the identity of numerous individuals including "Perico."  (Hewitt Aff. ¶ 65).

SA Hewitt's affidavit also explains that physical surveillance was helpful to the investigation but insufficient to meet its overall goals because locations necessary to the investigation are difficult to observe due to heavy vehicle and pedestrian traffic which would bring attention to investigative activities.  (Hewitt Aff. ¶¶ 71, 73, 75, 78-80). While surveillance reveals some actions of the members of the organization, it does not reveal the reasons for the actions or what goes on behind closed doors.  (Id.).  In addition, agents may not be able to be physically present to observe at the times that significant things happen, and the targets of the investigation often engage in counter surveillance, heat checks, and are conscious of people following them.  (Id.).  Similarly, electronic surveillance is useful for locating and tracking people, but without the benefit of intercepted phone calls, agents cannot determine the significance of an individual's actions at such locations.  (Hewitt Aff. ¶ 80).

The Affidavit explains that while confidential sources have provided information helpful to the investigation, their efforts are not sufficient to accomplish the investigation's goals.  SA Hewitt explains that based on her experience in MDTOs, people working for large scale organizations generally perform discrete tasks and are compartmentalized such that the members of the organization are unaware of all the other members and their roles within the organization.  Additionally, members are often unwilling to discuss the structure and operation of the organization with lower level

40

members. (Hewitt Aff. ¶ 68). Thus, it is unlikely the investigation's confidential source, who does not know every member of the MDTO and who only negotiates with one member of the organization, will be able to help meet the investigative goal of identifying all of the members of the organization. (Hewitt Aff. ¶ 67). For the same reasons, it is unlikely that additional cooperating individuals and undercover agents with access to higher echelons of the organization could be developed. (Hewitt Aff. ¶ 68). Moreover, because members of such organizations are distrustful of unknown individuals and use violence, it would be unlikely for cooperating individuals or undercover agents to become more than just a customer of the organization and too dangerous for individuals working under cover to try. (Hewitt Aff. ¶¶ 69-70).

The affidavit further explains that searches and trash pulls have not been effective in helping to reach the higher levels of the organization. (Hewitt Aff. ¶ 84). Furthermore, information gained during the searches, such as ledgers and other documents, is difficult to decipher without the assistance of information gained during intercepted calls. (Hewitt Aff. ¶ 84). The affidavit explains that at the stage of the investigation when the affidavit was given, interviews and grand jury subpoenas were problematic because they would risk exposing the investigation to people with ties to the target subjects and their associates, thereby harming the investigative efforts. (Hewitt Aff. ¶¶ 86, 88). Even if the interviews were conducted, the compartmentalization of the organization was expected to limit the scope of the information the witnesses could supply and the witnesses would likely not speak freely

41

due to fear of incriminating themselves or threats of violence from the organization. (Hewitt Aff. ¶¶ 87-88). Accordingly, this Court concludes that the Government has established necessity for interception of TT4.

### 2. TT5-TT7

Likewise, SA Hewitt provided sufficient information within her affidavit to support the conclusion that interception of TT5, TT6, and TT7 was a necessity. SA Hewitt's affidavit, prepared one month after the affidavit submitted in support of the intercept to TT4, reports the investigatory goals and the same problems if the investigation were to be confined to reliance on less-intrusive methods. (Hewitt 2 Aff. ¶¶ 75-101). Accordingly, this Court concludes that the Government established the necessity for the interceptions of TT5, TT6, and TT7.

### C. Franks Hearing

Defendant further contends that he is entitled to a Franks hearing to determine the full extent of information gathered from the cooperation of confidential sources and for the Government to show how it exhausted the conventional means of investigation available to them before seeking a wiretap. Entitlement to a Franks hearing requires a defendant to make a substantial preliminary showing establishing that the affiant deliberately or recklessly included a false statement or failed to include material information, in the warrant affidavit. Franks v. Delaware, 438 U.S. 154, 155-56, 171 (1978); United States v. Gray, Nos. 12-10990, 12-11856, 2013 WL 6038485, at *7 (11th Cir. 2013). Defendant, however, has not made any preliminary showing that SA Hewitt

42

deliberately or recklessly included a false statement in her affidavit or that she omitted material information from her affidavit.  Accordingly, Defendant has not demonstrated his entitlement to a Franks hearing.  See United States v. Wilson, 314 F. App'x 239, 243-44 (11th Cir. 2009) (rejecting defendant's argument that he was entitled to a Franks hearing to show that the investigation could proceed with the confidential informant and without wiretaps because he failed to demonstrate a substantial preliminary showing that a false statement was contained in the affidavit); Degaule, 797 F. Supp. 2d at 1361 n.23 (rejecting defendant's request for a Franks hearing "to determine the full extent of the information gathered from the cooperating individuals in [the] case and the extent and potential value of the information and evidence that could have been realized had the conventional investigation continued" because the defendant did not make a substantial preliminary showing that a false statement or omission, intentionally or with reckless disregard for the truth, was included by the affiant in the warrant affidavit).

**D.    <u>Minimization</u>**

Defendant contends that law enforcement agents failed to comply with the minimization requirement in 18 U.S.C. § 2518(5) in connection with the interceptions of TT4-TT7 because given that subject targets included all "others as of yet unknown," the subject target class is unlimited.  Defendant further contends that because the targets' discussions may be in Spanish, subject to interpretation by the investigative agent for their criminal meaning, it would be impossible for the individuals intercepting the calls to determine what would define a communication not subject to interception.  Under 18

43

U.S.C. § 2518(5), electronic surveillance must be conducted in such a way as to minimize the interception of communications not otherwise subject to interception. 18 U.S.C. § 2518(5); De La Cruz Suarez, 601 F.3d at 1214-15. Section 2518(5) does not forbid the interception of all nonrelevant conversations, but rather instructs law enforcement to conduct the surveillance in such a manner as to minimize the interception of such conversations. Scott v. United States, 436 U.S. 128, 140 (1978). When reviewing a challenge to the government's minimization efforts, courts are required to make an objective assessment of the monitoring agents' actions in light of the facts and circumstances confronting them at the time. United States v. Gonzalez Perez, 283 F. App'x 716, 722 (11th Cir. 2008). The standard to be applied when analyzing the Government's action is reasonableness. Van Horn, 789 F.2d at 1501.

Defendant's challenge to the Government's minimization efforts fails because Defendant does not present any specific information tending to show that the Government failed to minimize interception of irrelevant calls. A general allegation that the government did not comply with statutory minimization requirements is inadequate; the defendant must identify particular conversations so that the government can explain the reason why the conversation was not minimized. United States v. Carter, 449 F.3d 1287, 1295 (D.C. Cir. 2006) (rejecting objection to minimization requirement where defendant did not identify specific conversations that were not minimized so that the government could explain why the conversations were not minimized); United States v. Giacalone, 853 F.2d 470, 482 (6th Cir. 1988) (holding that the burden of production

44

and persuasion rests on person seeking to suppress wiretap evidence on the basis of improper minimization and that defendant was not entitled to a hearing on the issue); United States v. Lockett, No. 12-11991, 2013 WL 4528941, at *5 (11th Cir. Aug. 28, 2013); United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985) (holding that "[a] motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented" and "must allege facts which, if proven, would provide a basis for relief"); United States v. Olmedo, 552 F. Supp. 2d 1347, 1367 (S.D. Fla. Apr. 28, 2008); United States v. Duarte-Rosales, No. 1:05-CR-197-6-TWT, 2008 WL 140665, at *3 (N.D. Ga. Jan. 11, 2008) (rejecting minimization challenge because the defendant asserted no specific facts to suggest that the requirements were not met).  Without some showing on Defendant's part, this Court cannot conclude that the Government did not minimize its interception of non-pertinent calls or that a hearing should be held to require the Government to prove that it properly minimized interception of irrelevant calls. Giacalone, 853 F.2d at 483; United States v. Gordon, No. 11-CR-20752, 2013 WL 461780, at *7-8 (E.D. Mich. Feb. 7, 2013).

To the extent that Defendant's challenge to the Government's minimization efforts should be viewed as a challenge to the procedure for minimization that was to be used, Defendant's challenge still fails.  Defendant argues that if the discussions to be intercepted are in Spanish, subject to interpretation by the investigative agent for their criminal meaning, it is impossible for individuals who are intercepting the calls to

45

determine what would define a communication not subject to interception.  In this case, however, according to SA Hewitt's affidavits and the applications, agents expected the intercepted calls to be in Spanish and intended to use Spanish-speaking individuals acting under the supervision of investigative or law enforcement officers to conduct the interception contemporaneously.  (Hewitt Aff. ¶ 91; Hewitt 2 Aff. ¶ 104).  Each monitor conducting the investigation would review written minimization instructions prepared by Government counsel, the affidavits in support of the wiretaps, and the Court Orders authorizing the wiretaps as well as sign a form indicating that he has reviewed the aforementioned documents and will intercept communications in compliance with the Court's Orders.  (Hewitt Aff. ¶ 89; Hewitt 2 Aff. ¶ 102).  SA Hewitt's affidavits also explain that interception of communications would be suspended immediately if the conversation was not criminal in nature or related to the criminal offenses in the wiretap orders.  (Hewitt Aff. ¶ 90; Hewitt 2 Aff. ¶ 103).  Furthermore, to the extent that a communication is conducted in code and the code is not readily interpretable contemporaneous to interception, minimization would be accomplished as soon as possible after interception.  (Hewitt Aff. ¶ 91; Hewitt 2 Aff. ¶ 104).  This is acceptable under 18 U.S.C. § 2518(5), which provides:

> In the event that the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after interception.  An interception under this part may be conducted in whole or part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

46

18 U.S.C. § 2518(5).  Defendant, however, does not explain how the procedures were inadequate, explain how instructions given to Spanish speaking monitors were inadequate, or how Spanish speaking individuals under the supervision of agents would not have been able to monitor communications so as to avoid intercepting irrelevant communications.

Similarly, this Court is unpersuaded by Defendant's argument that because the wiretap procedures allowed for interception of conversations among "others as of yet unknown," they were not properly minimized.  The wiretap statue only requires that an application for a wiretap include the identity of the person, if known, committing the offense and whose communications are to be intercepted.  18 U.S.C. § 2518(1)(b)(iv). As recognized by the Supreme Court "the clear implication of this language is that when there is probable cause to believe that a particular telephone is being used to commit an offense but no particular person is identifiable, a wire interception order may, nevertheless, properly issue under the statute."  Kahn, 415 U.S. at 157.  Moreover, according to the application, affidavit, and Order, the interception of wire communications would terminate if it was determined that the conversation was unrelated to communications subject to interception under the wiretap statute or if the conversations were not criminal in nature.  (Attachment B, Order, ¶ 1 (providing that the wiretaps would be conducted pursuant to the application); Attachment D, Order, ¶ 1; Application for TT4 ¶ 17; Application for TT5-TT7 ¶ 17; Hewitt Aff. ¶ 90; Hewitt 2 Aff. ¶ 103).  Thus, the fact that the wiretap order allowed interception of calls by others not

yet known does not mean that the government did not comply with statutory minimization. United States v. Killingsworth, 117 F.3d 1159, 1165-66 (10th Cir. 1997); cf. United States v. Urban, 404 F.3d 754, 773 (3rd Cir. 2005).

## MOTION TO SEVER

Defendant filed a motion to sever his trial from the trial of his co-defendants in this case, pursuant to Bruton v. United States, 391 U.S. 123 (1968), to the extent that any of his co-defendants have made statements that refer to or implicate him. Severance is not warranted at this time. Rule 8(b) of the Federal Rules of Criminal Procedure allows for joinder of defendants where "an indictment charges multiple defendants with participation in a single conspiracy and also charges some but not all of the defendants with substantive counts arising out of the conspiracy." United States v. Alvarez, 755 F.2d 830, 857 (11th Cir. 1985); see also Fed. R. Crim. P. 8(b). "[T]he general rule is that [d]efendants indicted together should be tried together, especially in conspiracy cases." United States v. Chavez, 584 F.3d 1354, 1359-60 (11th Cir. 2009); Alvarez, 755 F.2d at 857. On the other hand, Rule 14 of the Federal Rules of Criminal Procedures provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). When a court is confronted with a motion to sever, the court must "balance any . . . prejudice [to the defendants] against the interest of judicial economy." United States v. Blankenship, 382 F.3d 1110, 1120 (11th Cir. 2004) (internal

48

quotation marks and citation omitted).  The Supreme Court has established a two-step test to determine whether a court should grant a motion to sever: (1) the defendant must first show that a joint trial will prejudice him; and (2) the defendant must also demonstrate that less drastic measures will not suffice.  United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007) (citing Zafiro v. United States, 506 U.S. 534, 539 (1993), and Blankenship, 328 F.3d at 1122)).  Although rare, prejudice may be shown: (1) where the defendants rely upon mutually antagonistic defenses; (2) where a co-defendant would exculpate the moving defendant in a separate trial, but will not testify in a joint trial; (3) where inculpatory evidence will be admitted against one defendant that is not admissible against another defendant; and (4) where a cumulative and prejudicial "'spill over'" effect may prevent the jury from making an individualized determination as to each defendant based on the evidence presented.  Chavez, 584 F.3d at 1360-61.

Defendant asserts that severance is warranted because his co-defendants gave statements to police after their arrests in which they attempt to explain their actions and the actions of other defendants.  In Bruton, the Supreme Court held that post-arrest statements made by non-testifying co-defendants that incriminate other defendants are inadmissible into evidence because such statements violate the other defendants' Sixth Amendment rights to confront and cross-examine adverse witnesses.  Id., 391 U.S. at 126.  The Supreme Court concluded that "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the

49

defendant, are deliberately spread before the jury in a joint trial," limiting instructions by the court will not suffice to eliminate the prejudicial effect of the introduction of such statements. Bruton, 391 U.S. at 135-36. Defendant, however, since filing his Motion to Sever, has not described the alleged statements, identified which codefendant(s) made the statements, or indicated whether such codefendant(s) are going to trial or have pled guilty. As such, the undersigned is unable to evaluate Defendant's Motion or any remedial efforts the Government may plan to undertake to avoid a Bruton problem. Accordingly, the undersigned **DEFERS** Defendant's Motion to Sever to the District Court. See United States v. Bushay, 859 F. Supp. 2d 1335, 1383 (N.D. Ga. 2012) (magistrate judge deferred motion to sever to district court because defendant's motion did not state which co-defendants made implicating statements nor did it state whether such co-defendants were going to trial or had pled guilty); United States v. Escobar, No. 1:10–CR–86–RWS–ECS, 2011 WL 4708417, at *1 (N.D. Ga. Aug. 26, 2011).

## CONCLUSION

Based on the foregoing, Defendant's Motions to Suppress should be **DENIED**. Docket Entries [121, 122, 158, 159, 207]. Defendant's Motion to Sever is **DEFERRED** to the District Court for adjudication. Docket Entry [123].

**SO ORDERED, REPORTED AND RECOMMENDED** this  20th  day of December, 2013.

s/LINDA T. WALKER
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

50